Commonwealth of Pennsylvania, Department of Environmental Resources and Carroll E. Ditzler, George D. Charles, John R. Albert, Jay A. Felty, Dale M. Yocum, Samuel Hartman, II, Charletta K. Weyland, also known as Charletta K. Addison, Carl R. Sherk, William E. Checket, Bryon L. Clark and Dennis F. Turner, Intervening Appellees *v.* City of Lebanon, Appellant.

Argued September 9, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Samuel G. Weiss, Jr.,* for appellant.

*Michael S. Alushin,* Special Assistant Attorney General, for appellee.

*James T. Reilly,* with him *Egli, Walter, Reilly and Wolfson,* for intervening appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, December 2, 1975:

The City of Lebanon was issued a water supply permit by the Department of Health on February 19, 1970. Section 3 of the Act of April 22, 1905, P. L. 260, 35 P. S. §713, (commonly known as the "Water Supply Act"). Lebanon's application for the permit, as well as the permit itself, recited the City's intent to fluoridate the proposed

water source. Lebanon's new water treatment facility began operations on September 15, 1972, and fluoridation was initiated about two months later.

By letter dated January 12, 1973, Lebanon requested the Department of Environmental Resources (DER)[1] to allow a modification of the existing water supply permit, specifically, the discontinuance of the fluoridation treatment. DER responded by letter on September 6, 1973, and refused Lebanon's request. Thereafter, certain of Lebanon's citizenry filed an appeal from said refusal with the Environmental Hearing Board (EHB). On February 25, 1974, Lebanon's City Council adopted a resolution directing discontinuance of the fluoridation program within ninety days. This resolution prompted the institution of an action in equity, brought by a pro-fluoridation group of Lebanon's citizens, in the Lebanon County Court of Common Pleas. Finally, on March 27, 1974, by stipulation of the various interested parties, Lebanon agreed to stay its resolution to discontinue fluoridation pending a final judicial disposition of the legal questions raised. In return, Lebanon received permission to intervene in the appeal before the EHB. Additionally, the Common Pleas equity action was apparently discontinued. By opinion and order dated January 3, 1975, DER's refusal to allow a modification of Lebanon's water supply permit was sustained by the EHB. This appeal followed.[2]

In its letter refusing the proposed modification of Lebanon's water supply permit, DER stated its rationale

---

1. On January 19, 1971, the authority over the issuance and regulation of water supply permits was transferred from the Department of Health to the then newly created DER. The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, *as amended, as added* by the Act of December 3, 1970, P. L. 834, 71 P. S. §510-18(1).

2. The pro-fluoridation citizens' group has intervened before this Court, thus bringing all of the interested parties into a single forum.

as the "discontinuation of the established fluoridation program would have detrimental public health effects. . . ." The use of the phrase "established fluoridation program" is not insignificant since DER has adopted a policy (which it attempts to enforce here) by which applicants for water supply permits are *not* required, on the one hand, to make provision for fluoridation treatment as a precondition to the receipt of a permit, while, under this same policy, those permit holders who initially elect to provide fluoridation are not allowed to modify their permits so as to discontinue this treatment. The support for this "discretionary" application of DER's alleged authority under the Water Supply Act is assertedly found in Section 3.

"No municipal corporation, private corporation, company, or individual shall construct waterworks for the supply of water to the public within the State, or extend the same, without a written permit, to be obtained from the Commissioner of Health [now Secretary of DER] *if, in his judgment, the proposed source of supply appears to be not prejudicial to the public health. . . ."* 35 P. S. §713 (Emphasis added.)

DER asserts, and justifiably so, that this section vests the Secretary with the discretion to determine what conditions are or are not "prejudicial to the public health." Further, the Secretary's determination that a "proposed source of supply is not prejudicial to the public health" is a necessary condition precedent (of which there may be others) to the issuance of a water supply permit. This same condition precedent would also attach to a proposed modification of an outstanding water supply permit. Again, there may be other such conditions precedent, but the potential for prejudice to the public health has been the only condition precedent relied upon by DER in this controversy. The question thus arises: Has the Secretary exercised his discretionary power under Section 3, and, having done so, has he found that the absence of fluori-

dation is "prejudicial to the public health," thereby causing a failure of the condition precedent to the proposed modification of Lebanon's permit? The answer is simply, "no."

Obviously, and despite language to the contrary in DER's letter refusing Lebanon's proposed modification, the Secretary does not, in his discretion, view the absence of fluoridation as being "prejudicial to the public health." If it is prejudicial for a water supplier to discontinue an established fluoridation program, then it is equally prejudicial for DER not to require all applicants for water supply permits to provide for fluoridation as a precondition to the receipt of their permits. That DER has chosen not to so require, as a continued course of conduct, is more persuasive evidence of how the Secretary has exercised his discretion under Section 3 than the language contained in a single letter.

We are also disturbed by DER's apparent abdication of authority in the determination of what conditions prejudice the public health. Such a determination should rest upon a more substantial and studied analysis than whether or not an applicant for a water supply permit elects to include a fluoridation program within his or her initial application. DER's "policy" allows the applicant to become the final, though unwitting, arbiter of whether the absence of fluoridated water prejudices the public health. We cannot countenance such a flagrant, albeit circuitious, delegation of authority by DER.

It must be noted that we have no quarrel with DER's basic procedural assumption that all proposed modifications of an outstanding water supply permit are subject to the Department's approval, but its right to disapprove because of prejudice to public health is no greater nor less than its power and duty to compel action to combat or overcome the same hazard, if such it be. As applied to this case, DER's role in acting upon the City's application is limited to determining whether the actual me-

chanics involved in disengaging the fluoridation equipment will adversely affect the other components of the water supply system and thus prejudice the public health.

In conclusion, should DER decide, in the future, that the absence of fluoridation treatment is indeed "prejudicial to the public health," then DER must, absent compelling reasons, require the provision of fluoridation from all applicants for water supply permits.[3] DER's discretion lies in its determination of prejudice to the public health, not in its decision to enforce that determination.

Accordingly, we enter the following

ORDER

Now, December 2, 1975, the order of the Environmental Hearing Board is reversed, and the Department of Environmental Resources is directed to allow the proposed modification of Lebanon's water supply permit.

———

DISSENTING OPINION BY JUDGE WILKINSON:

I must respectfully dissent.

I cannot agree with the statement of the majority:

"If it is prejudicial for a water supplier to discontinue an established fluoridation program, then it is equally prejudicial for DER not to require all applicants for water supply permits to provide for fluoridation as a precondition to the receipt of their permits."

Certainly we can all agree that there is a substantial difference of opinion on the beneficial or detrimental effects of fluoridation. To me, DER's policy of refusing to require fluoridation to obtain a permit and the refusal to modify a permit previously issued to allow discon-

———

3. Of course, should that time arise, we may then be asked to decide whether, under its statutorily prescribed authority, DER has abused its discretion by requiring fluoridation from *any* applicants for water supply permits.

138

tinuance of fluoridation after it is established is not inconsistent. Indeed, it is sound on the basis of burden of proof alone.

In the first instance, when fluoridation is not required to obtain a permit, the applicant is resisting fluoridation and the burden would be on DER to establish that to approve an unfluoridated water supply would be prejudicial to the public health. In the second instance, where the existing permit requires fluoridation, the applicant is seeking to change the permit and, therefore, has the burden of convincing DER that it is not prejudicial to the public health to remove the requirement.

In addition, in my opinion, expense is always a proper consideration in setting requirements for what is or is not detrimental to the public health as those words are used in legislation. Certainly it is a proper consideration when one is exercising discretion. Under such circumstances, there is a vast distinction between insisting on a very substantial expense to obtain a permit and permitting its removal after it and the permit have been in existence. I would affirm.

Judges ROGERS and BLATT join in this dissent.